IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LYNDA D.,[1]

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

    Defendant.

Case No. 6:24-cv-01551-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

    Plaintiff Lynda D. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Title II Disability Insurance Benefits and Title XVI Social Security Income under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## BACKGROUND

Born in September 1977, plaintiff alleges disability beginning April 20, 2021, due to "fibromyalgia, diabetes, Bells Palsy, depression, migraines, tachycardia, chronic sinusitis, low back pain, shoulder and neck pain, [and] poor eyesight." Tr. 229, 255. Her applications were denied initially and upon reconsideration. On February 29, 2024, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 44-69. On March 14, 2024, the ALJ issued a decision finding plaintiff not disabled. Tr. 27-38. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 29. At step two, the ALJ determined the following impairments were medically determinable and severe: "obesity; fibromyalgia; degenerative disc disease of the cervical spine; degenerative disc disease and scoliosis of the lumbar spine; chronic sinusitis; major depressive disorder; panic disorder; and posttraumatic stress disorder." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 30.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b) except:

> she can stand/walk a total of two hours per day. She can never carry objects over uneven terrain. She can occasionally push/pull up to the exertional limits with the bilateral upper extremities. [Plaintiff] can occasionally climb, balance, stoop, kneel, crouch, and crawl. She can occasionally reach overhead bilaterally. Additionally,

Page 2 – OPINION AND ORDER

> she would be limited to simple and routine tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, few workplace changes, no interaction with the public, and only occasional interaction with co-workers and supervisors.

Tr. 32.

At step four, the ALJ determined plaintiff was unable to perform any past relevant work. Tr. 36. At step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy plaintiff could perform despite her impairments, such as routing clerk, marker, and router.[2] Tr. 37-38.

## DISCUSSION

Plaintiff argues the ALJ erred by discrediting: (1) the May 2023 medical opinion of Kimel Limon, Psy.D., and (2) her subjective symptom statements.

**I.   Medical Opinion Evidence**

Plaintiff argues the ALJ improperly rejected Dr. Limon's most recent medical opinion. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which opinions are most "persuasive." 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive the opinions are." *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a

---

[2] The VE clarified that, for the representative occupations identified, "there is no contact with coworkers that would happen as part of the performance of the functions of the job" – rather, any coworker contact would be "incidental." Tr. 66.

Page 3 – OPINION AND ORDER

minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

Plaintiff first presented for a "Comprehensive Psychodiagnostic Examination" with Dr. Limon in April 2022. Tr. 392. Following a clinical interview – during which plaintiff "reported having recurrent memories, recurrent dreams, and flashbacks" of her 2001 sexual assault, "remain[ing] at home a lot," and "panic attacks . . . four or five times per month" – and review of mental health records, Dr. Limon described plaintiff's current functioning:

> ACTIVITIES OF DAILY LIVING: [S]he does not need prompts to take a shower, dress or groom. She is able to take medications without reminders. [Plaintiff] is unable to travel independently. She is able to attend to household responsibilities with no assistance. [Plaintiff] is able to pay bills, count change and use a checkbook. She states she is able to use the telephone with no assistance. She related she is able to cook and follow a recipe. [Plaintiff] describes a typical day as waking, tend[ing] to chores, call[ing] her mother, watch[ing] TV and prepar[ing] meals.
>
> SOCIAL AND INTERPERSONAL FUNCTIONING: [Plaintiff] reports she has a good social support system and has friends she socializes with regularly. She reported she does not engage in social events. She reports she is unable to shop independently.

Tr. 395, 397. His "Mental Status Examination" revealed the following findings:

> GENERAL APPEARANCE & BEHAVIOR: [Plaintiff] presents as a casually-dressed, fairly-groomed female who appears her stated age. Eye contact was good throughout the interview. [She] sat comfortably and was cooperative throughout the interview. No abnormalities in presentation were noted.
>
> STREAM OF MENTAL ACTIVITY/FLOW/SPEECH: Her speech is spontaneous. Receptive language comprehension is grossly intact. The process of thought, as reflected in speech, is intact.
>
> CONTENT/PROCESS OF THOUGHT: [Plaintiff's] content of thought is appropriate to the situation. She denies any active suicidal/homicidal ideation. She was able to sustain goal directed thinking . . .
>
> MOOD/AFFECT: She describes her mood as "most of the time mellow." She appears stable at this time. Her affect, as expressed in speech and demeanor, is characterized with a full range of emotion . . .

Page 4 – OPINION AND ORDER

> MEMORY: Working: Immediate recall for three unrelated words is intact (table, ball, cup) Recent: Delayed recall of these words after five minutes is 1/3 (tree, table). Remote: [Plaintiff] was able to state date of birth and social security number.
>
> FUND OF KNOWLEDGE/INFORMATION: Intact. How many eggs are in one dozen: "12." What is the Capital City of Oregon: "Salem." Who is the President of the United States: "Biden." Where is the Statue of Liberty: "New York."
>
> CALCULATIONS: Adequate. [Plaintiff] struggled performing serial 7s, subtracting 7 from 100 (93, 86, 79, 72, 65), but was eventually able to perform the task. She was able to state that 4x5=20. She stated that there are 9 quarters in $2.25.
>
> ATTENTION/CONCENTRATION/PERSISTENCE: [Her] concentration was within normal limits. She was able to spell the word money forwards and backwards (yenom).
>
> ABSTRACT THINKING/REASONING: Intact. [Plaintiff] was asked what an apple and banana have in common and she stated they're "both fruit."
>
> JUDGMENT: Social judgment is adequate. [Plaintiff] was asked what she would do if she was the first person in a movie theatre to smell smoke or see fire, and she stated, "I would alert someone."
>
> INSIGHT: [She] has fair insight into her mental status and need for treatment.

Tr. 395-96. Dr. Limon additionally denoted that plaintiff was "oriented to all spheres," and did not report unusual fatigue or appear preoccupied with pain/internal stimuli. *Id.*

Based on this information, Dr. Limon diagnosed plaintiff with posttraumatic stress disorder and panic disorder. Tr. 397. In the "Functional Assessment/Medical Source Statement" section, the doctor wrote:

> [Plaintiff] would be able to manage money in her own best interest.
>
> [She] has mild difficulty remembering and carrying out both simple and complex tasks as evidenced by having reduced recent memory. She had difficulty performing serial sevens, but was eventually able to complete the task.
>
> [Plaintiff] is mildly impaired in her ability to sustain concentration and attention, and persist in work-related activity at a reasonable pace. She was reasonably able to perform spelling money forwards and backwards. She had difficulty performing serial sevens, but was eventually able to complete the task.

Page 5 – OPINION AND ORDER

> [Plaintiff] is markedly impaired in her ability to maintain effective social interaction on a consistent and independent basis, with the public. She related she has started having panic attacks when someone approaches her that she does not know. Her fears have caused her to remain at home; however, when she is alone she tends to check the locks on the doors and windows all the time. She has no difficulty interacting with coworkers and supervisors.
>
> [She] has mild impairments in her adaptive functioning, requiring reminders and assistance. She is unable to travel independently or shop independently secondary to her fear of the public, which induces panic attacks.

Tr. 397-98.

In May 2023, plaintiff returned to Dr. Limon for a second "Comprehensive Psychodiagnostic Examination." Tr. 524. Following a clinical interview – during which plaintiff reported increased depression "over the last 9-12 months," ongoing recurrent memories/dreams/flashbacks of her 2001 sexual assault, "remain[ing] at home a lot," and "panic attacks . . . three to four times per week" – and review of mental health records, Dr. Limon related plaintiff's "current level of functioning":

> ACTIVITIES OF DAILY LIVING: [S]he needs prompts to take a shower, dress and groom due to increased dysphoria. She is unable to take medications without reminders. [She] is unable to travel independently and does not leave her home alone. She is unable to attend to household responsibilities without encouragement due to increased dysphoria. [Plaintiff] is able to pay bills, count change and use a checkbook. She states she is able to use the telephone with no assistance. She related she is able to cook. She reported difficulty following a recipe because she is having difficulty focusing. [Plaintiff] describes a typical day as waking, tend[ing] to chores, call[ing] her mother, watch[ing] TV and prepar[ing] meals. She reported she is living in a house with her husband. She reported she relies on her husband for financial support.
>
> SOCIAL AND INTERPERSONAL FUNCTIONING: [Plaintiff] reports she has a good social support system and has friends she socializes with regularly at home. She reported she does not engage in social events and she does not like crowds. She reports he is unable to shop independently.

Tr. 528, 530-31. The doctor's "Mental Status Examination" disclosed the following findings:

> GENERAL APPEARANCE & BEHAVIOR: [Plaintiff] presents as a casually-dressed, fairly-groomed female who appears her stated age. Eye contact was good

> throughout the interview. [She] sat comfortably and was cooperative throughout the interview. No abnormalities in presentation were noted.
>
> STREAM OF MENTAL ACTIVITY/FLOW/SPEECH: Her speech is spontaneous. Receptive language comprehension is grossly intact. The process of thought, as reflected in speech, is intact.
>
> CONTENT/PROCESS OF THOUGHT: [Plaintiff's] content of thought contains negative ruminations. She denies any active suicidal/homicidal ideation, but she thinks about death. She was able to sustain goal directed thinking . . .
>
> MOOD/AFFECT: She describes her mood as "fearful, sad." She appears depressed at this time. Her affect, as expressed in speech and demeanor, is characterized with a constricted range of emotion . . .
>
> MEMORY: Working: Immediate recall for three unrelated words is intact (pony, quarter, orange). Recent: Delayed recall of these words after five minutes is 2/3 (pony, orange). Remote: [Plaintiff] was able to state date of birth and social security number.
>
> FUND OF KNOWLEDGE/INFORMATION: Intact. How many eggs are in one dozen: "12." What is the Capital City of Oregon: "Salem." Who is the President of the United States: "Some old dude, Biden." Where is the Statue of Liberty: "New York."
>
> CALCULATIONS: Mildly Impaired. [Plaintiff] was unable to perform serial 7s, subtracting 7 from 100 (93, 87). She was able to state that 4x5=20. She stated that there are 9 quarters in $2.25.
>
> ATTENTION/CONCENTRATION/PERSISTENCE: [Her] concentration was impaired. She was unable to spell the word money forwards (money) or backwards (yenum).
>
> ABSTRACT THINKING/REASONING: Intact. [Plaintiff] was asked what an apple and banana have in common and she stated they're "both fruit."
>
> JUDGMENT: Social judgment is adequate. [Plaintiff] was asked what she would do if she was the first person in a movie theatre to smell smoke or see fire, and she stated, "I would probably tell everybody."
>
> INSIGHT: [She] has fair insight into her mental status and need for treatment.

Tr. 528-30. Dr. Limon also observed that plaintiff was "oriented to all spheres," and did not report unusual fatigue or appear preoccupied with pain/internal stimuli. *Id.*

Page 7 – OPINION AND ORDER

He diagnosed plaintiff with posttraumatic stress disorder, panic disorder, and "major depressive disorder, recurrent, mild." Tr. 530. In the "Functional Assessment/Medical Source Statement" section, Dr. Limon wrote:

> [Plaintiff] would be able to manage money in her own best interest.
>
> [She] has moderate to marked difficulty remembering and carrying out both simple and complex tasks as evidenced by having reduced recent memory. She was unable to perform serial sevens.
>
> [Plaintiff] is moderately to markedly impaired in her ability to sustain concentration and attention, and persist in work-related activity at a reasonable pace. She was unable to perform spelling money forwards and backwards. She was unable to perform serial sevens.
>
> [Plaintiff] is markedly impaired in her ability to maintain effective social interaction on a consistent and independent basis, with the public. She related she has started having panic attacks when someone approaches her that she does not know. Her fears have caused her to remain at home; however, when she is alone she tends to check the locks on the doors and windows all the time. She began having panic attacks at work and was unable to return to her day shift.
>
> [Plaintiff] has moderate to marked impairments in her adaptive functioning, requiring reminders and assistance. [She] stated she needs prompts to take a shower, dress and groom due to increased dysphoria. She is unable to take medications without reminders. [Plaintiff] is unable to travel independently and does not leave her home alone. She is unable to attend to household responsibilities without encouragement due to increased dysphoria. She reported difficulty following a recipe because she is having difficulty focusing. She is unable to shop independently.

Tr. 531-32.

The ALJ found Dr. Limon's opinions "partly persuasive":

> The opinions are supported with explanation and largely supported with observations in these evaluations but the opinions regarding moderate to marked limitations in the area of understanding, remembering and applying information are not supported by observations in this evaluation and are not consistent with the medical evidence of record overall. The other opinions in the May 2023 report regarding "moderate to marked" limitations are not consistent with the medical evidence of record due to their vagueness. The medical evidence of record supports moderate limitations in concentration, persistence, or pace, and her ability to adapt or manage. The "moderate to marked" limitations from the May 2023 examination

are not persuasive because Dr. Limon fails to discuss or provide an explanation for the significant decline in [plaintiff's] functioning over the previous year. There is no support for marked limitations in the medical evidence of record and the May 2023 exam appears to reflect [plaintiff's] functioning on that particular day as opposed to her functioning throughout the evaluative period. For example, a December 2022 mental status exam showed the claimant recalled 3/3 words after 5 minutes.[3]

Tr. 36.

As a preliminary matter, the Court notes the ALJ's mental RFC is fairly restrictive – i.e., plaintiff is limited to "simple and routine tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, few workplace changes, no interaction with the public, and only occasional interaction with co-workers and supervisors." Tr. 32. Plaintiff fails to identify how the rejected portions of Dr. Limon's May 2023 opinion result

---

[3] In evaluating the "paragraph B" criteria at step three, the ALJ determined plaintiff was moderately impaired in adapting or managing oneself and concentrating, persisting, or maintaining pace; mildly impaired in understanding, remembering, or applying information; and markedly impaired in interacting with others. Tr. 31-32. Central thereto was a discussion of Dr. Limon's opinions: "Following the first clinical interview in April 2022, [plaintiff] was noted to have a mild limitation in [understanding, remembering, or applying information]. Following the second interview in May 2023, she was found to have a moderate to marked limitation. These interviews were conducted 1 year apart. Dr. Limon did not provide an explanation for these significantly differing opinions. In treatment notes, [plaintiff's] memory is [consistently] described as intact [which] supports no more than a mild limitation in this area . . . Dr. Limon reported [plaintiff's] concentration as unimpaired during the first clinical interview. Her concentration was impaired during the second interview. In treatment notes, [she] is noted [to] have good attention and concentration. The evidence supports no more than a moderate limitation in [concentrating, persisting, or maintaining pace] . . . Dr. Limon observed [plaintiff] was fairly groomed during both interviews. There is no evidence [that she] missed or no-showed appointments. At the hearing she testified that she no longer drives due to her anxiety. She has difficulty getting out of bed due to her pain. This is consistent with a moderate limitation in [adapting or managing oneself]." *Id.*; *see also Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022) (the court must look "to all the pages of an ALJ's decision" when reviewing the ALJ's findings). Thus, the ALJ appears to have largely accepted Dr. Limon's May 2023 assessed limitations, except in regard to understanding, remembering, or applying information.

in additional work-related restrictions.[4] *See* Pl.'s Opening Br. 9 (doc. 9) (asserting only that the "improperly discounted evidence should be fully credited as true," which supports a finding of disability, and citing to the VE's testimony that an individual who was "absent from work more than twice per month at unscheduled times" or "off-task more than 15 percent during the workday" is not competitively employable).

In any event, the Court finds the ALJ properly considered the supportability and consistency of Dr. Limon's May 2023 opinion. An ALJ may find a medical opinion unpersuasive where it is inconsistent with the provider's own chart notes. *Stiffler v. O'Malley*, 102 F.4th 1102, 1107 (9th Cir. 2024). Similarly, inconsistency with the medical record is a valid reason to find a medical opinion unpersuasive. *See, e.g.*, *Hahn v. Berryhill*, 722 Fed.Appx. 602, 605 (9th Cir. 2017); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Here, because the April 2022 and May 2023 assessments are similar, it is unclear on what Dr. Limon based his more severe restrictions. For instance, he observed "mild" impairment in plaintiff's May 2023 calculations – i.e., instead of struggling to complete serial 7s like in April 2022, she was unable to proceed during the May 2023 assessment past the initial subtraction. Her immediate memory remained the same and her remote memory actually improved – plaintiff recalled two out of three unrelated words after five minutes in May 2023, whereas in April 2022

---

[4] Plaintiff's main argument is that the ALJ "fail[ed] to consider the cyclical nature of [her] mental symptoms." Pl.'s Opening Br. 7-9 (doc. 9). But the ALJ did not rely on isolated instances of improvement to discredit Dr. Limon's opinion. Rather, as addressed herein, the ALJ reasonably determined that Dr. Limon's May 2023 assessment did not accurately reflect plaintiff's functioning during the relevant period in light of the longitudinal record. This is especially true considering that plaintiff experienced stress associated with the evaluation itself. *See* Tr. 704 (plaintiff reporting in May 2023 "she has her psych eval on Friday and is concerned that if they state she is fine, she will not get disability and will have to sell her car to get some money . . . her mom and [mother in law] have been making some payments for her for awhile. She spoke about the stress not having any income has been putting on them").

Page 10 – OPINION AND ORDER

she could only remember one out of three words after five minutes. Other than being unable to spell "world" backwards in May 2023 (which she was able to do in April 2022), the only other differences appear to be based on plaintiff's presentation on the day in question, and reports of increased depression and panic attacks.

The record otherwise demonstrates that plaintiff consistently presented with a "grossly intact" memory upon examination, both before and after Dr. Limon's May 2023 assessment.[5] Tr. 9, 490, 687, 691, 706, 722, 743. There are a number of additional references in the record to plaintiff's recent and remote memory being "intact" as evidenced by her recall of words, reference to remote events, and/or interactions with medical providers. Tr. 399, 402, 406, 678. Likewise, plaintiff's concentration and cognition were repeatedly noted to be "good" or within normal limits in light of her "ability to state the days of the week backward" and the general content of her conversations with providers, even when depressed. *See, e.g.*, Tr. 9, 399, 402, 406, 411, 490 519, 678, 686-87, 691, 706, 722, 743.

Further, plaintiff was able to keep track of her medications and appointments, journal, do "puzzles. . . on her phone that she enjoy[ed]," play games, and negotiate stressful financial and family situations that required "helping a lot of people" and applying for public assistance. Tr. 485, 701, 704, 711, 720. The record also demonstrates that plaintiff continued to get her hair and nails done and engage in household tasks, spend time with her family (including at her parent's house despite conflict with her father), and seek medical care when she wanted or believed she

---

[5] In fact, although plaintiff occasionally self-reported problems with memory and/or concentration – often related to her physical impairments – there is only one reference in the medical record to clinical signs of cognitive issues. *See, e.g.*, Tr. 7, 411, 489, 676, 714. In March 2022, while "establish[ing] mental healthcare," plaintiff's provider noted: "recent [m]emory is impaired as evidenced by recall of 2/3 words after 5 minutes, remote memory is intact as evidenced by [ability] to recall the events of September 11, 2001." Tr. 409-11.

need to (such as after being bitten by her dog). *See, e.g.*, Tr. 480, 704, 720, 726, 729. And plaintiff's own statements at the hearing bely Dr. Limon's opinion. Notably, as described in Section II, plaintiff testified to social anxiety, physical impairments, and problems leaving the house; she did not, however, endorse any memory or concentration issues, nor did she indicate an inability to complete the mental demands of her past employment. The ALJ's decision is upheld as to this issue.

II.     **Plaintiff's Testimony**

Plaintiff next contends the ALJ erred by discrediting her testimony concerning the extent of her impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2017 WL

5180304. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

> At the hearing, plaintiff first explained why she stopped working at Walmart after 23 years:
>
> They went through some reconstruction and they eliminated the department manager position. And the department managers that they chose [had] to take a severance or find a position within the store. I had noticed that my anxiety with dealing with people rising a lot. So, I actually spent my last three months on overnights, and coming back to days on three different attempts I failed because I had a major panic attack. So, in January of '21, I felt that taking the severance was the best thing for me.

Tr. 50. When asked "if there was a specific trigger . . . that caused your anxiety to increase those last few months," plaintiff responded: "I can't say what triggered it. I just know that it got really bad." Tr. 51-52. Plaintiff testified that she switched to the graveyard shift so she "didn't have to deal with the public" but ultimately could not sustain that schedule because she "wasn't sleeping during the day": "I'm a morning person by nature . . . plus having the body pains." Tr. 52-53.

She testified that she was currently unable to work due to the "anxiety of actually dealing with people" she did not know, which she linked to a 2001 sexual assault. Tr. 53-54. Plaintiff felt "most conformable in my house with my doors locked and my windows [up] and curtains drawn so nobody can see in." Tr. 54. She reported that her mental health medications helped to a degree: "[I]f I wasn't on them that I wouldn't leave the house at all. I know that I calm down and not let my mind, you know, take over so much but at times I feel like even though I'm on the medication . . . I'm about ready to explode [from] that anxiety buildup." Tr. 55 As a result, plaintiff explained that her mother had started driving her places within the last two years. Tr. 56.

Page 13 – OPINION AND ORDER

> In terms of physical symptoms, plaintiff testified that she had pain "all over":
>
> It really started in my feet and then my lower back and my neck and shoulders. And it just kind of – there's days that I couldn't actually get out of bed and stand up on my feet because they hurt so bad. Then my skin gets so sensitive to even putting on some really soft clothes, whatever I would feel like it was rocks scratching me. And it comes and goes and sometimes when it goes to, you know, it can last a few days or a few hours. But definitely my feet and my lower back are painful every day. And then my -- right between my shoulder blades. Range of movements, I guess, it hurts so much to move.

Tr. 57. Plaintiff stated that her pain medications "definitely do help some" but there still are times when she cannot get out of bed – "anywhere from maybe two or three times a week to sometimes daily." Tr. 58-59. She reported that these physical issues existed while she was working, causing her to miss "more and more days." Tr. 59. Plaintiff also endorsed chronic sinus problems and associated headaches, and tingling/numbness on her right side for the past six months. Tr. 60-62.

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 33. The ALJ then proceeded to tersely summarize the medical record before concluding:

> The longitudinal medical evidence of record shows [plaintiff's] physical impairments have been relatively stable throughout the evaluative period. Objective medical imaging shows only mild degenerative changes in the lumbar and cervical spine. There is no indication [plaintiff] has been referred for surgery or even physical therapy for her impairments. Her obesity and fibromyalgia are being treated with medication management . . .
>
> Turning to [the] mental impairments, [plaintiff's] panic disorder and PTSD support limiting her to occasional contact with supervisors and coworkers and no contact with the public. This limitation is consistent with her treatment records showing she is able to maintain relationships with family and friends. She is able to leave the house to shop and to have her nails and hair done. Although [plaintiff reports] being unable to work due to her anxiety, her treatment records and testimony show

>   she did not stop working due to her impairments, rather, her position was eliminated and she did not wish to work in a more customer facing role. She also attends medical appointments.

Tr. 34-45.

The Court finds the ALJ's reasons for rejecting plaintiff's physical testimony are either legally insufficient and/or not supported by substantial evidence. That is, "providing a summary of medical evidence in support of a [RFC] finding" – even a detailed one – "is not the same as providing clear and convincing reasons for finding the claimant's testimony not credible." Lambert v. Saul, 980 F.3d 1266, 1278 (9th Cir. 2020). Stated differently, summarizing the medical record does "not provide enough reasoning [for a court] to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." Id. (internal quotations omitted).

And, to the extent the ALJ's decision can be read to indicate inconsistency with the objective medical evidence, this is impermissibly proffered as a stand-alone rationale. See Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007) ("whether the alleged symptoms are consistent with the medical evidence" is a relevant consideration, but "an ALJ cannot reject a claimant's subjective pain or symptom testimony simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence") (citations omitted); see also Brown v. Colvin, 2014 WL 6388540, *5-6 (D. Or. Nov. 13, 2014) (reversing the ALJ's credibility finding where the only reason supported by substantial evidence was inconsistency with the medical record).

While the record does reflect that plaintiff is prescribed and takes medication for her obesity and fibromyalgia, the ALJ did not suggest (nor can he) that those impairments are well-controlled. Despite starting Ozempic towards the end of the adjudication period, there is no indication of significant weight loss even after months of use. See, e.g., Tr. 7, 538, 541-44, 554,

Page 15 – OPINION AND ORDER

557, 570, 720-71, 730, 741. Additionally, plaintiff's fibromyalgia symptoms, including pain, persisted despite some improvement with the introduction of gabapentin and cyclobenzaprine. Tr. 7, 317, 320, 325, 393, 423, 444, 482, 519, 541, 546, 553, 566, 676, 730-31; *see also Revels v. Berryhill,* 874 F.3d 648, 666 (9th Cir. 2017) (fibromyalgia symptoms may wax and wane, and there may not be a documented objective source of pain); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("statements must be read in context of the overall diagnostic picture . . . [that a person experiences] some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace").

      Moreover, it is well-established in this District that "mild degenerative disc disease can have disabling effects." *Dahl v. Comm'r of Soc. Sec. Admin.*, 2015 WL 5772060, *5 (D. Or. Sept. 30, 2015) (collecting cases); *see also Ellefson v. Colvin*, 2016 WL 3769359, *6 n.5 (D. Or. July 14, 2016) ("mild degenerative changes do not necessarily equate to mild functional limitations"); *Cortes v. Colvin*, 2016 WL 1192638, *4 (C.D. Cal. Mar. 28, 2016) ("an ALJ errs in relying on conservative treatment if the record does not reflect that more aggressive treatment options are appropriate") (citation and internal quotations omitted).

      Finally, although, as addressed in Section I, the medical evidence does not indicate any significant memory or concentration problems beyond those accounted for in the mental RFC, plaintiff consistently reported that anxiety and pain symptoms interfered with her employment. *See* Tr. 335 (plaintiff stating in January 2021 that she "is having a lot of issues, difficulties with working with other people [and is starting] to get social phobia . . . She does not think she can go back to day shift and start interacting with customers, but she does not want to be unloading freight and dealing with back pain. She gets panic attacks where her chest hurts just thinking of going to daytime or dealing with employees and customers"); *see also* Tr. 317 (plaintiff noting in August

2021 that she "[d]id not go through counseling after the rape and had been dealing with it [before it] start[ed] to manifest itself very severely . . . [she] was dealing with fibromyalgia and chronic sinusitis [and] started to miss more and more work . . . She is finding she cannot leave the house"), 340-44 (medical records from late 2020 showing multiple medical issues – including fibromyalgia symptoms – necessitating missed work).

In sum, the ALJ committed reversible error in evaluating plaintiff's subjective symptom testimony. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (only mistakes that are "non-prejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

**III.    Remedy**

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1090-1100 (9th Cir. 2014). The court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011); *see also Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

As discussed herein, the ALJ committed harmful legal error by failing to properly evaluate plaintiff's subjective symptom testimony. Further proceedings would nonetheless be useful in this

case because the record is ambiguous as to plaintiff's functional abilities. On one hand, it is undisputed that plaintiff's fibromyalgia, back/neck pain, and anxiety/panic symptoms are longstanding and unlikely to be entirely remediated with treatment, especially considering plaintiff's constellation of impairments. On the other hand, plaintiff refused available treatment options – namely, EMDR therapy – and also experienced a number of situational stressors that appear to have exacerbated her symptoms during the adjudication period. *See, e.g.*, Tr. 7, 14, 655, 676, 685, 689-90, 696-97, 704, 714.

As such, further proceedings are required to resolve this case. *See Treichler*, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Given the interplay between plaintiff's fibromyalgia, back/neck pain, and mental health impairments, the use of a medical expert specializing in the appropriate discipline would be helpful. Therefore, upon remand, the ALJ must consult a medical expert to review the entire record and opine as to plaintiff's functional abilities during the adjudication period and, if necessary, reweigh the medical and other evidence of record, reformulate plaintiff's RFC, and obtain additional VE testimony.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 4th day of June, 2025.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge